I'm assuming that the Napolese will be dividing their time, so you'll have to kind of keep track for yourselves if you can. Your Honor, the appellants will reserve two minutes. May it please the Court, I'm Gary Greenwald on behalf of the appellants seeking to overturn a district court decision which dismissed our amended complaint for failure to allege sufficient proof to maintain a breach of fiduciary duty claim grounded in a failure to sell employer securities. Plaintiffs contend that the decision is erroneous for three reasons. First, because the district court held the plaintiff to a pleading standard which violated the federal rules of civil procedure, the applicable case precedent of this circuit in Concha, and the congressional purpose of ERISA. Secondly, that the plaintiffs, in fact, did plead sufficient facts with particularity to meet even this high standard. And thirdly, that the presumption of reasonableness, which was the predicate for the decision of the court based upon the mentioned Cooper line of cases, should not have applied because this case, this company, no longer had an ESOP. And the plan that was in effect at the time of the transactions which were challenged stated that the plan was not to be primarily invested in employer securities. Go ahead, Your Honor. You're going to ask me a question. Pardon? I don't know. I didn't look at that because we're dealing with a period through 2001, and I didn't want to inject into the record something that's not relevant. The theory of damages, the difference between the current market price of the stock and what it was at its peak shortly after Allegheny acquired it? Not necessarily because the ESOP was shut down in around 2001, and we don't know what happened to the assets that the ESOP had. They may have been sold. They may not have been sold. I don't know. But the plan was terminated. Let me tell you what's troubling me about your position in this case, Mr. Greenwald, and that is that the cases that you cite seem to be fairly distinguishable on the grounds that the company was basically headed south and ultimately failed. And there's an allegation that the fiduciaries knew, either had access to insider information, some sort of information that was not publicly available. Whereas here we have an ongoing business, a merger or acquisition, and a continuing sort of corporate, you know, the train keeps chugging along and the stock price goes up and down like it does in the economy generally. And I'm having a hard time seeing why there's a breach of fiduciary duty. Well, first of all, putting aside the pleading issue, and that's what you want me to do, what the court didn't recognize is there are very specific reasons why an ESOP fiduciary should sell these securities, employer securities, after a merger. Expert testimony would have carved that out. Even in the restrictive plan document? There wasn't. It says you've got to have a certain percentage? No, it didn't say that at all. Well, no, that's different. At the time that the merger took place, that was the event called the transformation. And under the transformation date, both the plan and the trust specifically stated that the plan was not to be primarily invested in employer securities. So it basically took away that requirement that it be primarily invested. What counsel for the appellees have referred to is a provision in the diversification section that applies only to the employees, which calls for the employees to keep 15 percent of their assets in employer securities. But that says nothing about what the fiduciary's responsibility was to sell the securities in the event that prudence should require it. Now, Your Honor, going to my first argument, and this is really the key of why I'm here, I'm an ERISA practitioner. The decision that holds an ESOP participant to this high standard of pleading is so damaging to the congressional purpose of ERISA. I thought I had to be here and take this appeal. The Congress has specifically stated that it is a number one priority of ERISA, that the participants recover the full extent of their damages where there have been fiduciary violations. The high standard of pleading requires participants to allege facts which are so great at such an early point before discovery that claims could be lost that exist. And for those reasons, the congressional purposes of ERISA would be violated by this kind of high standard. Yes, Your Honor. Then are you essentially arguing that it is never proper to grant a motion on the pleadings where there is an allegation of a breach of fiduciary duties, that you've got to at least proceed to the summary judgment stage or trial and give the plaintiffs an opportunity to conduct adequate discovery to particularize the breach? That's not what we're saying. But if the pleading – Some cases go that far, don't they? Some cases do. Some cases do. But, of course, this Court is the – you know, carved out the decision that's probably the most important decision in the United States on this issue. The Contra case is cited by courts all over the United States as the premier case in this point. And there have been multiple rulings that you don't apply the particularity standard to a breach of fiduciary duty case citing the Contra case. So what the district court did with all deference to the district court was the district court ignored that ruling and proceeded to fashion her own level of proof that was required for a breach of fiduciary duty case, which most courts reject, at least most district courts. And Tosch is the only circuit case on this subject. I'm still hung up. And it may be that I just misunderstood your argument. I apologize. But I'm hung up on the fact that there's a distinction between exempt EIPs and ESOPs. And I still don't understand why this isn't an exempt EIP with a restriction on, in essence, being more heavily invested in employer stock than would normally be the case. Your Honor, we are not contending that this is not an IAP, an eligible. We've dropped that argument. But the issue with an eligible IAP is whether the diversification exemption applies. And for intents and purposes, we're here. We're not contesting the fact that it, as an eligible IAP, it is entitled to go beyond the 15 percent level. However, that's a totally different question than the issue of the reasonableness presumption, which was erected in Mention Cooper, which apply only to ESOPs. But there's a tension there between a plan that has as its fundamental presumption that a substantial amount of the assets will be held in the stock of the company that employs the beneficiaries, and a theory that you urge upon us, if I understand it correctly, that the fiduciaries breached their duty to those beneficiaries by not further diversifying the assets in the face of a plan that contemplated heavy investment in employer stock. Your Honor, there is a very big distinction between an ESOP and an IAP. The ESOP must be primarily invested in employer securities. An IAP can be invested over the 15 percent level under certain circumstances. But because it can be invested doesn't mean that there should be a presumption that they must hold those shares. Why not? Because the purposes of an ESOP are twofold. On the one hand, it's to permit the employers to be a part of the company, a shareholder in the company. But at the same time, another critical issue is that the fiduciaries must assure that the assets are protected so that the retirement will exist as these people retire. And that's why the most important event in the history of an ESOP is the sale of a company. When a company is sold ñ You're using ESOP again, so I thought we were back to IAP. Because I'm trying to show the distinction. Okay. And what I'm trying to say is that the reasonable presumption shouldn't apply for simply an IAP unless it's an ESOP. And I'm saying that because ñ and I'm using the situation of a merger, which is the key point here. In a merger, the retirees are going to capture the benefit of a transaction that can be a once-in-a-lifetime transaction. And the fiduciaries have to investigate that decision and determine whether it's in the best interest of the participants to proceed with that sale of their shares. Once they do, what the Applees are suggesting is they don't have any responsibility, if it's a stock-for-stock transaction, to capture the premium. And that's a devastating failure on the part of the fiduciaries not to at least investigate that issue. We didn't capture the premium. The premium doesn't go away. Capture the premium, Your Honor, would mean selling the shares, especially where they're in a public market, and capturing that premium. That premium then ñ Explain to me how the premium goes away if they don't sell at that instance. Well, the premium can go away. It can, but it doesn't have to. It doesn't have to. Well, that's the problem. Why do you assume that it's going to go away? Why do you have to capture it before it might run away? Because you might, in fact, benefit by owning a greater number of shares. Well, Your Honor ñ It seems to me the fundamental premise of the case has to be that the market price is wrong and that the trustees are expected to know it. And I just don't understand where that premise comes from. Your Honor, I must respectfully disagree with you, because any time a person serves as a fiduciary with respect to a stock transaction, they must make a judgment. If we were to accept the position that the stock may go up or it may go down, then the fiduciary wouldn't have any responsibility at all, because they could just say, well, you know, I don't care. I'm holding employer securities. If it goes down and the retirement is lost, then that's too bad. But the fiduciary has a responsibility to protect those assets for the retirees. Well, that's an empty phrase. What does it mean? What is it the fiduciary is supposed to look at? It means, Your Honor, that they must look at the conditions of the company in light of their present circumstances. They must look at the benefit that they've already realized from a particular transaction, and they have to consider the likelihood as to whether that benefit is going to be lost in the future. And I'm sure that you can understand that sometimes acquisitions occur with highly leveraged companies that put themselves in a position through those acquisitions where the value of that company may be eroded in the short term. And all we're saying here is that these fiduciaries had a duty, once they made the decision to sell their shares, to make a decision as to whether to sell the stock that they got for that, for the sale of their Oramet stock, and determine whether it was in the best interest and prudent to continue to hold the shares of ATI or to sell. I have one question to clarify for myself. Excuse me. Whether you have continued to claim or whether you have ceased to claim that there should have been an amendment of the plan, that there was a breach of fiduciary duty in failing to amend the plan to allow the sale of a higher percentage of the employer's stock. We're not contending that there should have been a sale. I'm sorry, we're not contending that there should have been an amendment because of the fact that the amendment constitutes plan design. And so there is, in fact, a part of this plan document that says that the fiduciaries can have the participants make amendments to the trust instrument if it's going to affect the whole basis of the plan. But we're not saying that that's the case here. So that claim is not? We're not proceeding on the basis that there is a breach of fiduciary duty by failing to amend the plan. Okay, thank you. Is my time up or? Let me raise, I see. Thank you, Your Honor. Let me raise a very important point. I mean, we've talked about this distinction between an ESOP and a non-ESOP, and even some of the cases that have been decided by other courts have recognized there's a question as to whether this reasonableness presumption should apply when it's not an ESOP. And the recent case of Duke Energy, which was cited by the Apple East, raises that very point. So there's clearly a question today in America as to whether the Mensch-Cooper doctrine should be applied when it's not an ESOP. And that's clearly the case here where the plan itself says that on the transformation date, it's no longer to be primarily invested in employer securities, and the language of the plan clearly gives the trustee or the administrators the right to make the decision as to whether to sell shares and invest in other assets. Isn't there a typical restriction, though, in a stock-for-stock transaction that the shares cannot be traded? Well, there may be for like 60 days. I thought I saw one that was up to a year. Well, there can be, but that's not usually with a public company. ATI is a public company. So normally when you have a private company that does the acquisition, they may have those requirements that you hold the stock in compliance with the federal securities laws, but this was a public company. The last point I really would like to make, and there's just simply no way to understate the importance of this conscious case, the conscious case makes it very clear that there is a serious distinction between fraud and breach of fiduciary duty and that the participants must be entitled to obtain their discovery and present their case. And if we were to extend or create an exception for CONSHA by saying that the Mensch-Cooper reasonableness presumption is a basis for creating an exception to CONSHA, we are going to get into exceptions that are going to swallow up the rule. In fact we're dealing with a different kind of an animal. I mean, there may be a legitimate reason why we ought to have an exception here, and that is because this is a restricted plan. Restricted in what sense? Where the plan says that it no longer needs to be primarily invested in employer securities, it's not restricted at that point. And that's the point, the transformation date is the key, because I would agree with you that prior to that transformation date that argument might work, but both the plan and the trust, which is in the record, state very specifically after that transformation date, after the plan no longer has a majority of its assets primarily invested in employer securities, it is not an ESOP and is not to be primarily invested. And that basically opens the whole thing up to the fiduciary exercising its proper fiduciary duty to decide what's in the best interest of the plan participants. They're the people that are losing the money here. Thanks. Thank you. That will take us now to the appellees. Let us know what your intentions are. What your intentions are. May it please the Court, my name is Brian Ortelier, and I represent the appellee Oregon Metallurgical along with the individual appellees. The Court should note that I plan to use no more than 7 1⁄2 minutes of my time, and will cede the balance or whatever remains to Mr. Diane, who is counsel for the union. If needed, Mr. Lamb is here as counsel for Key Trust to answer any questions the Court may have regarding the Director-Trustee. I submit that the issues before the Court are much simpler than the plaintiff appellant suggests. The Court is not presented with a question whether the minimal notice pleading requirements have been satisfied here, as the plaintiffs variously contend. Rather, I submit that the narrow question properly posed is whether the plaintiffs effectively pled themselves out of court after admitting in the district court that Allegheny Technologies was a sound and viable company at all relevant times. Once the plaintiffs chose to affirmatively submit this evidence and the admissions in paragraph 77 of the third complaint, they negated or precluded the possibility of their later rebutting the presumption of prudence, which is derived from the Third Circuit's opinion in Munch and the Sixth Circuit in Cooper. By choosing to go beyond the minimal notice pleadings requirements, plaintiffs' adduced evidence, which I submit, is fatal to their claims. Given the specific admissions in paragraph 7 and the corresponding exhibits, which I believe are in volume one of the appendix, Judge Brown properly concluded that during the relevant time period, Allegheny was not facing collapse or some irreversible cataclysm. Rather, it was a profitable company paying dividends to shareholders. Now, of course, we're all aware of the rule, the federal rule, that a shortened plain statement is sufficient to state a viable cause of action. But when the plaintiffs go beyond and submit, and I commend to the court the scrutiny of the complaint, along with its accompanying exhibits, is a couple hundred pages long, but once the plaintiffs go down that path, they stand the risk of offering up evidence, along with their pleadings, their attesting to its veracity, that may undermine their complaint or their cause of action, which is this Court's ruling in the Weisbach opinion, which I think can be found at either page 36 or 37 of our brief. In Weisbach, this Court, and now I'm quoting, held, a plaintiff may plead herself out of court. If the pleadings establish facts compelling a decision one way, that is as good as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts. Now, of course, we ought to look at these admissions next to the governing legal framework. ERISA section 404A1D requires fiduciaries to adhere to the terms of a plan so long as those documents are consistent with the statute. There can be no dispute here that the plan documents were consistent with ERISA. The plan is, as the plaintiffs admit, I believe on page 33 of their brief in a footnote, that at all relevant times the plan was an eligible individual account plan expressly permitted by the statute to invest up to 100 percent of its assets in employer securities. More specifically, to facilitate such investments, ERISA goes further. It relieves eligible individual account plan fiduciaries under section 404 from the duties to diversify and also the duty of prudence insofar as it relates to diversification. So how do you respond to Mr. Greenwald's argument that that's all well and good up to the point of the acquisition, but as a result of what he called the transformation? The transformation. Well, that restriction no longer applies. I have some trouble with the argument, mindful of his admission in the first instance, that throughout the plan was an eligible individual account plan. Now, he says it was transformed from an ESOP to a stock bonus plan. But the special protections in ERISA are not for ESOPs. If you look at section 407 and 404, they are for eligible individual account plans, of which stock bonus plans and ESOPs are but two examples. You can also have thrift plans and savings plans. So that's really of no consequence. And further, the trust agreement specifically says that at all times the employer could include, the plan sponsor could include in the trust stock of affiliates, and again, which contemplates the possibility of a merger or acquisition, which, by the way, tracks the relevant. It doesn't necessarily contemplate the merger. There could be affiliates to begin with. Well, it's a broad word, which if you look at the particular language of the trust agreement, is taken right out of ERISA. And what it embraces are parents, subsidiaries, and related companies. But there was no limiting language. But my point is it doesn't explicitly deal with new affiliates as distinct from existing affiliates, does it? Well, what I'm saying is when you're dealing with an eligible individual account plan, and again, you have to examine the plan document against the backdrop of the congressional goal of facilitating employee ownership. And then what you have is this acquisition by Allegheny Technology of Orometh. If you look at that particular language, the trust agreement permits the substitution of one plan sponsor for another. So I don't think it's particularly remarkable that here there was an acquisition, and it doesn't trigger these exceptional circumstances that counsel suggests. I don't see in the statute, and maybe I'm missing something, that there's a specific recognition of the possibility of merger and acquisition and how it should be dealt with. I tend to agree with you, Your Honor. But the corollary of that point is that the statute doesn't preclude substitution of one plan sponsor for another in the event of an acquisition. And again, the plaintiff's argument really, as Your Honor points out, is that the price of the stock went up at that given point in time. There are no allegations of any impropriety, any inside information, that these fiduciaries somehow knew, I suppose, that the stock would later decline in its price, which is, I believe the panel's already pointed out. If you look at the way the cases are falling out these days in the district court, there's really two lines of cases. Those that involve fraud and all sorts of allegations of insidious conduct by the fiduciaries who it is alleged had knowledge of a likely cataclysm that in most instances led to a bankruptcy. Here there are no allegations, nor could there be. So we're left with the singular allegation that the mere drop in the price of the stock is enough to trigger a duty, along with a spiking of the price of the stock. I submit that presents a Hobson's choice that Congress didn't anticipate when it adopted these plans with the express purpose of encouraging employee ownership. Unless the Court has another question for me, I think I'll cede the podium to my own. The question that occurred to me is, would it have been any different if this had been an all-cash transact? Cash for cash? In other words, Allegheny Technology simply – There's no swap stock. Same result. Well, again, Your Honor, I can see no reason why a duty would be triggered in those circumstances. Or there's no allegations here. In terms of the plan, would the plan have terminated at that point? I'm not – I don't believe there's a provision that required plan termination. And it is true that it later terminated sometime later. Clearly, there would no longer be any additional company stock to, at least in Oregon metallurgies, to distribute. Well, again, nothing in the plan, I believe, required such a transaction. You wouldn't infer a requirement that they take the cash and then go back and invest that cash in Allegheny because it's the closest thing to an affiliate that would be left at that point. Well, again, as I pointed out a moment ago, if you're trying to encourage the goal of employee ownership, the best way to effectuate that continued interest is by substituting the one stock for the other, which I think is entirely consistent with the terms of the plan and the congressional intent. Unless the deal was so good that everybody decided to simply cash out. Well, we – you know, there are no facts. And, again, Your Honor, at the end of the day, we're left with one fact. The stock price went up. And based on the law, that's insufficient. And further, they pled that the company was profitable and viable during the relevant time period. Thank you, counsel. Mr. Dionne. Thank you. I'd like to address the point about what the plan documents required. For the first time, really, in the reply brief, the appellant or the appellants have suggested that, in the end, the plan documents really didn't require this minimum 15 percent holding. And there's no basis for that argument. I think it's crystal clear that the starting point of this case is that we have a plan that, in terms, required the holding of a minimum of 15 percent in these participant accounts. The argument is put forth. It's in the – it's stated in the provisions on – I think it's Section 12 on participant diversification. Unfortunately, a couple of the key pages were left out of the original record, so we put in our supplemental excerpts of record that have those missing pages. Section 12 of the plan, the trust agreement? Yeah, it's going to be Section – let me give you the exact article of the plan. It's Section 12B of what we were calling the plan agreement or the main plan document. It establishes a percentage cap. The cap is called the distribution allowance. It limits the amount of shares that the participant could withdraw from the stock account. Now, there's no – there's a suggestion here that the fiduciaries have the power under the plan, even in ordinary circumstances. Forget the extraordinary circumstances that they claim are here, but we say are clearly not. There seems to be a suggestion that the fiduciaries could have got together one day and said, forget the 15 percent. Let's sell all of this. We think it's a good time to sell. There's not a single word of the plan document that would support that. If the fiduciaries had done that, I would submit that would be a case that could be brought under, you know, 404A1D for breach of the plan's terms. In fact, the whole reason – they even plead that the company went to the union, and the company talked in 1996 about the need to lower that percentage allowance. Why would those talks have been – well, lower the percentage of allowance, because there was a fear that companies were going to quit – excuse me, that employees were going to quit and cash out that way. There's no – you can always quit your employment and cash out of an ESOP or an eligible IAP. So because there was a fear that the stock had actually appreciated so much at that point, that's why they lowered the percentage ultimately to 15 percent, and that would all be a silly exercise if all along the fiduciaries could have just sold this out from under the participants. Since the point really came up for the first time in the reply brief, we never briefed point by point each of their arguments about the plan language. I could do a little bit of that here. I would just say that the very first argument they make relies on a sentence from the trust agreement that on their own theory of the case no longer was applicable by the time of the merger, which is when their causes of action, they allege, begin to accrue. They refer to the first sentence of Section 5B of the plan agreement – excuse me, I think I said trust agreement before – but that first sentence of Section 5B had no force or effect once the so-called transformation date occurred, which they allege it did. So that's just one of the many points that they made very quickly in their reply brief about what the plan means that's contrary to a careful reading of the plan. So when you start with the premise that the plan required the holding of 15 percent, what you do have here is you have exactly the case that Judge Clifton identified. You have a case that can only succeed if the following legal proposition is true. The price of a stock is sufficient information to lead to some kind of duty to consider whether or not to depart from the plan's terms or from the ESOP or eligible IAP purpose of a plan. And we talked about exceptions swallowing rules. We don't want the rule to swallow – here we don't want the rule to swallow a very carefully designed exception to the diversification requirement. Congress clearly wanted and intended and sought to encourage not just ESOPs, although this was an ESOP to begin with, but also certain kinds of plans where employees would have a stake in the ownership of the company, including eligible IAPs. To give any force or life to that congressional purpose, you have to be very careful not to allow the Munch doctrine to kind of expand, to become – to swallow up the rule that eligible IAPs are perfectly proper. And the only way that the plaintiff's theory could succeed is if Munch becomes this open-ended doctrine that basically requires fiduciaries to engage in a form of market timing and to look at just price movements of the stock rather than the fundamentals of the company. All the cases that have succeeded, the plaintiffs have alleged something about the fundamentals of the company and not just what the public was valuing the company at in the fluctuations of the market. One other thing I'd add on the issue of the union as a defendant here. In response to Judge Graber's question, Mr. Greenwald said that they have abandoned the theory – the duty to amend theory. But it still kind of creeps in the back door in the union claim because their allegation for why the union is a fiduciary here rests on this notion of de facto control. And the only place that the de facto control comes from in the complaint is an allegation that there was this agreement in 1996 not to amend the plan. Well, if the union was simply exercising its right to enforce an agreement not to amend the plan, which the union secured through collective bargaining, then the union is not acting in a fiduciary role. And there are a number of cases, including three Supreme Court cases. Well, it helps you that they've abandoned that claim then, or if there was such a claim. Well, they've abandoned the claim. Because if they're not claiming that there's any fiduciary defaultation in refusing to amend the plan, then you're refusing to amend the plan along with the employer doesn't make any difference. That's right. And what I'm saying is the full consequence of the concession that they're not pursuing that theory is one the Court should appreciate, which is that the union shouldn't be in the case. I don't think that they've conceded that point. I just think it logically flows from the concession on their duty to amend theory. Thank you, counsel. We will give you a couple of minutes of rebuttal. I'll make it quickly. It's not often I get out to Seattle, so. Very quickly, Mr. Ortelier's argument. He suggested that paragraph 77 pleads us out by suggesting that ATI was a sound company. That's not the issue. The issue is not whether ATI was a sound company. The issue is whether it was prudent for the fiduciaries not to sell the ATI stock that they received in this merger transaction so as to capture the premium. In light of subsequent substantial decrease in value and the public reports that we're seeing, that ATI was a struggling company, a poor performer, and its future was not real good in the near term because of their industry and their ability to compete in that industry. That's what those documents say. You don't look at it from the standpoint, are they a company in bankruptcy or are they a sound company? The issue is whether it was prudent to remain invested in those securities or to protect the participants, safeguard their retirement, and to cash it out. The second — Back to Judge Clifton's concern, which, frankly, I share. Aside from the variation in the stock price, what more have you got here? I mean, I read those articles, and the articles are sort of ones that you typically see when industries go through normal economic up-and-down cycles. It doesn't mean the company is failing. In fact, didn't this company continue paying dividends throughout the entire period? We're not suggesting that it was failing. We're not suggesting it wasn't paying dividends. You raise a good point, and I've tried to stress this point to you, but maybe I'm not making myself clear. The merger is an independent basis for the reasonableness presumption. If you believe that it applies, and we contend it doesn't, but if you look at the case we cited to you in our recent additional case law precedent, the Apalco case is an amazing case. And that case, while it doesn't come directly down to this issue, that is a case involving a merger, where what the court did was the court said that the company was a fiduciary because it adopted an amendment to the plan after a merger, which prevented the company from selling the shares and required the company to keep the shares it received in the merger in the buyer company. And the court said that that raises a serious question as to whether they're a de facto fiduciary and whether that's a breach of fiduciary duty. And what that court realized is the same thing I'm trying to say to you, and that is that a merger transaction is such a unique and important transaction in the context of the life of an ESOP that it provides a basis, a compelling circumstance. And by the way, if we were to have gotten past this pleading stage, we would have had expert witnesses to testify that it was a compelling circumstance that would require sale because of the fact that it was important for the participants to realize their premium and not lose it in the face of the present economy. Would your argument be the same if six months later the share price had doubled from what it was on the day of the merger? Well, Your Honor, in other words, would I be arguing the other way? Of course not. That's what I thought your answer would be. But the thing is that the merger is such an important transaction, I'm sure that you can understand that I believe the evidence would show that the management members of this company cashed out. And, in fact, a number of the cases point out that one of the big issues is if you can show that the management members were cashing out, that that's evidence of prudence that supports the sale. But we weren't able to prove that because we were not able to get to the point of discovery. And that's why you may feel as though we're a long shot. And, of course, the courts that talk about these cases talk about it that way. But without being given the opportunity to conduct that discovery, this ESOP was effectively denied an opportunity to prove its case. Just one last point and I'll be done, and that was with respect to Mr. Dian. I just want to clear. Our claim against the union is it arises from the fact that the fiduciaries indicated that they would not take any action to sell the shares, nor investigate, because they felt that they were duty-bound by the side agreement and that they couldn't go against the union. And that's the basis for our argument, not the amendment. Thank you so much for your time. I have to ask one question because I'm not sure I understand. You referred repeatedly to a premium. I thought I knew what you were referring to. Now I'm not so sure. Okay. What do you mean by the premium has to be captured? The premium is the difference in the amount that ESOP received over the value of their Oramet shares on the date that the merger was announced. That upward, that increase represented 45 percent of the value of the shares before the merger was announced. And it is that premium that was gained at the time of the sale, but was subsequently lost as the stock price went down while the fiduciaries held the stock. And you're hoping, obviously, to find that the top management of the company cashed out. Absolutely. Not their premium, but ESOP did. Absolutely. All right. Thank you, Your Honor. Thank you. The arguments have been very interesting and helpful. We appreciate them. The case just argued is submitted. We'll take a short break before the last two argued cases. All rise. The court stands in recess. Thank you. The case is submitted.
judges: Graber, Tallman, Clifton